Whenever council are ready, we'll be pleased to hear argument in United States v. Gibbs, case number 12-4743. Mr. Condon. My name is Joe Condon and I represent Marcus Gibbs. We're here on appeal on a criminal case from the district court. And what I want to do is kind of focus on certain particular issues. First one had to do with a search warrant to get a ability to ping the defendant's cell phone. When that was issued, well, first of all, let me back up some. They based that warrant on two phone calls that happened on July 12, 2010. The warrant was obtained on July 15, 2010. And then subsequent to that, there was a traffic stop on July 21, 2010. What's really important about this particular matter is that they based the getting the warrant on two phone calls that my client had with a gentleman named Pedro Ochoa. They got the warrant and then they started pinging his phone calls. So they got the warrant on July 15, 2010. And then they pinged his cell phone and did that for a period of time. Now, the initial pinging is based strictly on those two phone calls in the context of an unverified transaction they said had occurred with Pedro Ochoa on the 12th of July, 2010. Then they get the warrant on July 15, 2010. And then they make a traffic stop on July 21, 2010. Now, they based that traffic stop, and it's critical in my client's case, that traffic stop. Because they based that traffic stop on the pinging of his phone that he went to an area near Atlanta, Georgia, Conyers, Georgia, and came back on the same day. They only spent like an hour or so in Conyers, Georgia. So you have a transaction happening on July 12, 2010 that they said happened between my client and Pedro Ochoa. They alleged that Pedro Ochoa is a known drug dealer and that my client had two phone calls with him in the context of communications that Ochoa had with people in Mexico. Now, they're saying that transaction occurred on July the 12th. They get the warrant on July 15th. And then my client has stopped on July 21, 2010. What I want to point out is that there is not a basis for the traffic stop or the warrant and the traffic stop, especially the traffic stop that happened on July 21, 2010. And the reason is that they have these two phone calls on the 10th. Then on the 11th, there's nothing. On the 12th, meaning they have it on the 12th is when the phone calls take place. Nothing happens on the 13th. Nothing happens on the 14th. They get the warrant on the 15th. They start pinging on the 16th. Nothing happens on the 17th. Nothing happens on the 18th. Nothing happens on the 19th. I'm sorry, Mr. Condon. Do I understand you're challenging only the traffic stop? No. I'm challenging the warrant, too, the initial warrant. Okay. But I guess what I wanted to do was focus on the warrant to get the warrant for the pinging, which is based strictly on two phone calls that my client had with Pedro Ochoa. Then the traffic stop, they're all kind of tied together because they used the pinging as a basis for the traffic stop on July 21. And what is important is that there is no reasonable articulal suspicion that criminal activity is afoot, even if you take for granted that they get the warrant for the pinging. And I don't concede that point at all because they only had two phone calls to base that warrant, to get that warrant on my client. Well, in the course of their investigation, hadn't they already discovered that there was a drug ring operating out of John Fallon close to Charleston, South Carolina? That's the background with regard to Pedro Ochoa. That is true. But my client basically has two phone calls with him, and that's all they have with regard to Mr. Ochoa. Well, but the other circumstances of him going to Atlanta and spending one hour there and then returning back to Charleston, that raises some suspicion. And he admitted when he was stopped that he'd been smoking marijuana, and the officer said that he was driving irrationally and drifting over into another lane. So that was his basis for making the stop. And if all of that was believed by the judge, then I think that's correct. Well, I think this case is distinctly different because, first of all, in other cases, like whether it's when you have, like, a pretextual stop, like in rent or on other occasions, there's a specific traffic violation that, like running a red light, doing something specific. And here, in this case, the officer has not what I call a concocted stop because my client did not violate any traffic violation, stayed within his lane, traveled within his lane. They're trying to say he made a one. I don't know what the officer said. The officer said he was drifting over into another lane. I think the testimony is that he never crossed that yellow line, that he drifted towards the yellow line and corrected. And I think that there is no basis, no traffic violation. They also came up with the idea that he had a license plate that partially covered, but he said Georgia license tag. But there is no true traffic stop, I mean, in the sense of a traffic violation. Does it have to be what you call a true traffic stop? I think it does because. What's your basis for that? Because I think in all the other cases, like in rent, when they run a red light or go through a stop sign, there has to be some articulable specific traffic. What you mean by a true traffic stop is an actual traffic violation. Right. Well, I don't think we have a traffic violation. But that's the officer testified that he was drifting. If it's not illegal to drift in a lane, if you don't cross the yellow line, don't go into the other lane, it's not illegal. I don't know whether he crossed the yellow line or not, but if he were drifting over into the center lane, which I guess would be oncoming traffic, after he turned off of Highway 17, I think he would have had the basis to stop him. First of all, he turns off of 17 onto Main Road. He goes down a very short distance. He actually turns into a place called Gilligan's Restaurant before the officer actually turns on his blue lights. So the idea that he, in fact— Let me interrupt you. When he turned off of I-17, did he get on just a two-lane road? Yes, sir. In other words, one going north and one going south. Right. Main Road is just a two-lane. I understand. So that would have been dangerous if he were drifting over into the lane for which oncoming traffic would have— If he, in fact, had drifted across the yellow line, but he did not. But you challenged below, as I understand. You contend it was a pretextual stop, but you haven't challenged the veracity of the officer. And he says in his testimony that he believed the driver was impaired based upon the wide turn and the movement within the lane. To give it to you that he didn't cross the lane, but the movement in the lane caused him to believe, from his experience, that he might be impaired. So he stopped. Well, I believe what happened in this situation is that the officer was instructed to do what's called a Waldorf stop. He was instructed to stop this car no matter what. And he was trying to base this on, initially, some kind of concocted traffic violation. Then they come up with the idea that he's part of a criminal conspiracy. And that's really what I wanted to emphasize, that they base the information conveyed to the officer that he's part of a criminal conspiracy on two phone calls that happened on July 12th. And the warrant is gotten on the 15th. And so between the 12th and the 21st, nothing happens except a singular drive to Conyers, Georgia, and back. Now, if I may. Yes, sir. Does that drive to Florida and the immediate return provide articulable suspicion at a minimum? A drive? To stop the car? Well, this is a drive to Conyers, Georgia, but no, it does not. Why not? Because all he's doing is going down to Conyers, Georgia, to a Jiffy Lube shop. This car is registered in Georgia, and therefore there's a legitimate basis for doing that. And there's no criminal intent or suspicion by just going. He had a meeting in Georgia, a brief meeting in Georgia, correct? He did meet someone in Georgia. Right. And then he comes immediately back. Given the background information that law enforcement had, I'm a little hard-pressed to see why that isn't, at a minimum, reasonable suspicion. To make the traffic stop. And, of course, once the traffic stop's made, there's the odor of marijuana, right? Yes, sir. So once the stop is made, there's probable cause. And that seems to me you're appropriately focusing on the propriety of the stop. Correct. And I understand your argument about the Waldorf stop. They didn't want to have to disclose the larger investigation, right? That is true. And so they asked this uniformed officer to follow him long enough to observe a traffic violation or a potential traffic violation. And any law enforcement officer who follows anybody in this courtroom, who leaves here and goes out, including us, who goes out and gets in his or her car and drives up Main Street, probably wouldn't have to get too far, right? That's very true. I think we would all be stopped. That's exactly what Wren allows. That's exactly what the dissenters in Wren complained about. That, in fact, the holding in Wren says any police officer anywhere in America can pull over any motorist anytime he or she chooses to. Because we all drive in a way that provides, at a minimum, articulable suspicion that we committed a violation. So how do you get around that? Well, I think you have to be able to realize that in Wren there was a clear traffic violation. And this officer says that he clearly had reasonable suspicion to believe that there was impaired driving because of the manner in which the car was operated, again, like Judge Floyd. I grant you, he didn't cross the double yellow line or the center line. But even weaving within a lane, there's lots of cases where weaving is found to provide sufficient cause to stop a vehicle. For two reasons, Your Honor, the distance in which he was followed, the fact that my client turned off into a restaurant, and then the blue lights were put on. I don't think that there was any sincere effort that there was a traffic violation. I think the officer was instructed, stop this car, no matter what. Okay? Does the record reflect that, or is that just your imagination? I think the fact that he had to do a walled-off stop and it's... You said you think that the officer was instructed to make the stop. The record doesn't reflect that, does it? Well, he was instructed to make a walled-off stop, and I think that implies that he was going to stop that vehicle no matter what. And I think it's different from Wren, and I think it's different from other cases, like in Branch, where there's a specific violation of a red light or a traffic stop sign. And those kind of situations, I think, are substantively different. In this case, I think my client is, first of all, they use this idea at the suppression hearing that he's part of a larger conspiracy. Well, we're talking about something that happened on July 12th, and they're stopping him on July 21st. And what's the significance of that? The fact that the... Of the nine-day gap? I think it's getting stale. I think the fact that it's... His involvement in a drug conspiracy is getting stale nine days later? Yes, sir. Because they have so little evidence. They only have two phone calls on July 21st. Nothing happens in between. But those phone calls are pretty awfully coincidental. They talk about $5,000, and money... Something was taken to Atlanta, and something was brought back. And the DEA officer testified that he was... Well, he's an expert, that he understood the code words between the two people who were talking, and it was related to a drug transaction. Well, in response to that, Your Honor, the fact that it happened on John's Island, the fact that they never made an attempt to try to verify either that the transaction took place or where Mr. Ochoa lived, I think is significant. So I think they tried to build up this idea that they had reasonable suspicion that a criminal conspiracy was going on on the 21st, when something happened way back on July 12th. And nothing in between that is in any way suspicious. First of all, I don't think they had probable cause to get the ping technology to ping my client, not only because based on just two phone calls on July 12th. Do they need probable cause for purposes of our review? Is it probable cause or a substantial basis to believe there was probable cause? I mean, at the appellate level, we don't really care whether there was probable cause or not, do we, under Leon? Well, I think the thing about Leon is that I think that when you look at it from the standpoint that whether the warrant on its face is so thin with regard to, I think it is. So you're relying on one of the exceptions. Right. It is not good faith to believe that based on those two transactions that there's a conspiracy going on. Because when you talk about all the other things that were going on, they had thousands of phone calls of Ochoa. And we're talking about two out of those thousands of phone calls. So I don't think that there was a basis for getting the warrant. I don't think there was a basis for the stop. I think the stop is critical in my client's case. There's no doubt about that. Because in that situation, I see my time's up. And I just think that that's the critical part of this case. Thank you, Your Honor. Thank you. You have some time reserved for rebuttal, Mr. Condon. Mr. Williams, good morning. Good morning. May it please the Court. My name is Nathan Williams. I'm an assistant United States attorney. I'm in the District of South Carolina. The critical factor in all of those searches was that they were all supported, apart from the Waldorf stop by search warrants. Defense argues that there wasn't underlying probable cause. But essentially, as Judge Davis talked about, the issue really is deference to the court determining what the magistrate had in front of him at the time of the issuance of the warrant. So as was argued by the defense, there are essentially three separate incidents all supported by either federal or state search warrants. The first warrant was for the geolocation device from the cell phone, often referred to as ping evidence. But that was based strictly on a series of phone calls involving that telephone and the information talked about on that telephone line. Mr. Gibbs hadn't been identified at that point in time. His telephone had been identified as being used in furtherance of the drug conspiracy. And specifically, although there were a small number of calls with Mr. Gibbs, there was an ongoing conversation on the other lines discussing the transporting of drugs from Atlanta or the Atlanta area to Charleston, South Carolina, as well as the necessity to get some money handled by who ended up being Mr. Gibbs to other people in the conspiracy higher up. So although there were maybe a small number of calls directly using Mr. Gibbs, this phone, there was clear evidence on those calls that Atlanta was the source of the drugs. And then when the geolocation data was used to show the travel to Atlanta, that's when the traffic stop was initiated. You know, without commenting on whether I agree there was sufficient information given to the master judge, I commend you for getting a GPS warrant because that has not been the case in lots of areas around this circuit and the country. Well, I believe there's, and I think it also goes to the getting the information off the telephones later when a warrant was obtained to, to get the information out of the phones. I mean, there's sort of some different opinions on that. I would, I would say that at least in our district, in our office, the preference is to get a warrant, at least for the prosecutors, maybe not the agents, but the Supreme court has said you should do. Oh yeah, we, we do our best. You know, we advise them that way. It's more work for them, but it's easier at this point for us. So essentially in all those cases, there were search warrants obtained. Um, it goes also to the information that was taken off the phones. So the, the agents could have done inventory searches. They could have done other things to get into the cell phones that were found subsequent to the traffic stop. They didn't do that. They, they stopped and got a search warrant. Now, understandably they got that from a, a state judge and consistent with the walled off stop concept. They, they did not want to reveal the ongoing investigation, the scope of the investigation. And certainly there's some risk in, in conducting a walled off stop in proximity to the travel to Atlanta. Um, but, but as Mr. Condon argued, the walled off stop concept is, is part of a bigger investigation. And although that's sort of a colloquial term to say walled off stop, the, the goal is to not reveal the larger ongoing investigation and yet gain evidence that helps in that investigation. So, so regarding all, all of those, um, situations, search warrants were obtained and certainly the stop was a pretext stop that, that is allowed. I would suggest to your honors that there were other factors involved, that there was a reasonable suspicion to stop the car based on the travel to Atlanta and the knowledge that the phone inside the car was being used to further that, um, conspiracy, that it would be evidence in itself. But more importantly, the officers did observe what they testified to was erratic driving, um, evidence of impaired driving and the district court judge found that that was sufficient along with other reasons, including the travel to Atlanta. Um, the other issues in the case deal primarily with sentencing. And there was, there was a question about a leadership enhancement questions about, um, a gun enhancement about the drug weights. I would, I would suggest that all of those were found on the record by the judge. Um, with evidence that was presented at trial, it was a long trial and extensive evidence was testified to regarding the weight of the drugs used, um, the amount of drugs that, that Mr. Gibbs himself handled or that he directed others to handle for him, including deliveries of cash to Atlanta. Um, apart from that, the judge did bury downward. Um, Mr. Gibbs is offense level, I believe was 46, which is several points off the chart that the guideline book has. Um, there was a, a downward variance of four points that put him at 360 to life, which was still four points at the top of the three 60 to life guidelines. So there was still a four point variance that could have been given to keep him at the same guideline range. And then the sentence of course was 360 months, which was the bottom of the guideline range for his criminal history points or category as well as offense levels. I'm not, again, I don't, if there are no other questions, I believe all the findings of the district court were recovered by the evidence provided the trial and that the trial judge did a good job of making his record at sentencing on the sentencing issue. So if there are no other questions, I have nothing else to add to the record. Thank you very much. Mr. May please court. I do want to add that I think in general that the case of Eileen versus the United States changes certain concepts. I know that Eileen strictly dealt with a mandatory minimum sentence and the L what the elements are required of that offense and need to be proven to a jury. But I think the, the framework of Eileen actually changes what, what I was, what we addressed here in with regard to the reliability of sentencing someone so that I look at Eileen changing that whole concept that the fact is that leadership obstruction, drug amounts to me are elements or crimes in and of themselves that need to be proven to a jury. And I think that's what the importance of, of the Eileen case is. I know it's just focusing on statutory mandatory minimums, but the whole idea that the certain things need to be proven to the jury rather than being found by a judge, by a preponderance of evidence is strictly so important to our system that it's important that we, that we actually change that issue so that leadership obstruction, drug amounts are, are proven to a jury beyond a reasonable doubt. Because from a defendant standpoint, it's wow, I'm getting tanked on the, on the beginning with 401B evidence and I'm getting tanked on the bottom, on the end with relevant conduct that may encompass not only unproven, unacquitted conduct, but also drug amounts that people are coming in and say that I did. So that's why I think the importance of Eileen is, I think it changes everything from the standpoint. And before, before Eileen came down, you know, you wonder whether to argue, you know, that the, the, the basis with regard to sentencing. I was actually wondering whether you argued Eileen in the district court. Well, I did not because it came out afterwards. That's right. And so, so you're asking us to apply plain error review under your, your, your version of Eileen in your 28 J letter. Yes, I think it's, it's, I think it's a, it's a case that actually changes things fundamentally. Well, you preserved it, I guess for us, but I don't know if you preserved it for the Supreme court, but in any event, your objections in the record. Yes, sir. Or your issues in the record. Well, I think it's, I think it is so important because it just changes the whole dynamic and the, and the way that things are looked at, that they're actually elements of the crime and not sentencing factors. Thank you. Thank you very much. No. Okay. We'll come down to Greek council and proceed immediately to our third and final case.
judges: Andre M. Davis, Henry F. Floyd, Clyde H. Hamilton